AO 91 (Rev. 11/11)   Criminal Complaint

| LODGED<br>CLERK, U.S. DISTRICT COURT<br>03/12/2021<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY: ____DM____ DEPUTY | # UNITED STATES DISTRICT COURT<br>for the<br>Central District of California | FILED<br>CLERK, U.S. DISTRICT COURT<br>03/12/2021<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY: ____GR____ DEPUTY |

|  |  |  |
|---|---|---|
| United States of America<br>v.<br><br>Aaron Robert Woodman<br><br><br>_____<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>) | Case No.  2:21-mj-01226 |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of    August 2015 and February 2019    in the county of    Los Angeles    in the

Central    District of    California    , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. Sec. 1343 | Wire Fraud |

This criminal complaint is based on these facts:

See "Complaint Attachment" attached hereto and incorporated herein by this reference.

☑ Continued on the attached sheet.

/s/
_____
*Complainant's signature*

Robert Chowthi, Special Agent, FBI
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date:    March 12, 2021

City and state:    Los Angeles, CA

*Karen L. Stevenson*
_____
*Judge's signature*

United States Magistrate Judge Karen L. Stevenson
_____
*Printed name and title*

*AUSA:*  Mark Aveis

**Complaint Attachment**

<u>Count One (18 U.S.C. § 1343)</u>

Beginning in or about August 2015, and continuing through in or about February 2019, in Los Angeles County, within the Central District of California, and elsewhere, defendant AARON ROBERT WOODMAN, knowingly and with intent to defraud, devised, participated in, executed, and attempted to execute a scheme to defraud individuals as to material matters, and to obtain money and property from such individuals by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.  The fraudulent scheme was carried out, in substance, in the following manner and by the following means, among others: defendant WOODMAN solicited individuals to give him funds that WOODMAN stated he would use for various real estate transactions.  In exchange, defendant WOODMAN promised, among other things, interests in real estate or high rates of return.  In fact, defendant WOODMAN did not use such funds for the purpose he had stated and, instead, WOODMAN used such funds for other purposes, including WOODMAN'S personal use.  In total, defendant WOODMAN defrauded such individuals out of more than approximately $700,000.

On or about June 28, 2017, within the Central District of California, defendant WOODMAN, for the purpose of executing and attempting to execute the above-described scheme to defraud, emailed to K.Z., on behalf of D.K., in the State of Washington, "wire instructions" for D.K. to wire funds to defendant WOODMAN for the purported purpose of facilitating defendant WOODMAN's real estate transaction relating to real property in Los Angeles, California, commonly referred to as 9401 Wilshire Boulevard, Los Angeles, California.

**AFFIDAVIT**

I, Robert Chowthi, being duly sworn, hereby declare and state as follows:

## I.   INTRODUCTION

1.    I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since March 2017.  I am currently assigned to the Long Beach Resident Agency to investigate white collar crime.  Prior to being employed by the FBI as a Special Agent, I was employed by Bank of America as a Global Financial Crimes Auditor for five years, ensuring that processes and controls were in place to prevent fraud and money laundering.

2.    Since graduating from the FBI Academy, I have participated in investigations relating to violent crimes, robberies, kidnappings, wire fraud, embezzlements, romance scams, investment fraud, and various types of financial institution fraud, including reviewing evidence, analyzing financial documents, conducting physical and electronic surveillance, working with informants, and executing search and arrest warrants.  Additionally, I have interviewed victims who have had personal knowledge regarding the investigation in which I have been involved.

## II.  PURPOSE OF AFFIDAVIT

3.    I make this affidavit in support of an application for a complaint and issuance of an arrest warrant for AARON ROBERT WOODMAN ("WOODMAN") for a violation of Title 18, United States Code, Section 1343 (Wire Fraud).

1

4.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from other agents and witnesses.  This
affidavit is intended to show merely that there is sufficient
probable cause for the requested warrant and does not purport to
set forth all of my knowledge of or investigation into this
matter.  Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only.

**III.  SUMMARY OF PROBABLE CAUSE**

5.    Between at least in or about August 2015 and in or
about February 2019, WOODMAN schemed to defraud individuals into
advancing or loaning him money that he claimed he would use in
real estate deals.  Instead of using as promised the
approximately $700,000 in funds that WOODMAN received from these
individuals, WOODMAN primarily used the funds to support
himself.  WOODMAN used interstate wires to communicate with the
investors via email and to receive and transfer funds that he
had obtained based on his fraudulent misrepresentations.  In
2019, after receiving multiple investor demands for repayment,
WOODMAN moved to Liberia from where he has continued to attempt
raise money by fraudulent misrepresentations.

**IV.  STATEMENT OF PROBABLE CAUSE**

**A.    WOODMAN Induced D.C. into Investing in the Purported
Purchase of a Colorado Warehouse**

6.    I interviewed D.C., a realtor in Los Angeles County,
who told me that:

2

a.   In or about August 2015, WOODMAN pitched D.C. an investment opportunity whereby WOODMAN would use D.C.'s money to purchase and operate a warehouse located in Colorado.  WOODMAN promised to give D.C. a partnership interest in the property for $150,000.  D.C. expected that his money would be used as WOODMAN had represented, namely, to purchase and operate a warehouse located in Colorado, and D.C. would not have parted with his money had he known that WOODMAND intended to use D.C.'s money for a different purpose.

b.   WOODMAN then told D.C. that WOODMAN needed $65,000 as a short-term loan to close the purchase of the Colorado warehouse.  D.C. agreed to make the loan without interest and without a writing because he trusted WOODMAN and expected to receive the partnership interest in writing.

c.   WOODMAN and D.C. executed a partnership agreement that WOODMAN prepared that provided that D.C. was a 30% partner in exchange for his $150,000 partnership contribution to WOODMAN and that WOODMAN was a 70% partner in consideration of WOODMAN's own $350,000 contribution.

d.   WOODMAN timely repaid D.C. the initial $65,000 loan.  D.C. could not recall exactly when or in what form WOODMAN repaid D.C., but D.C. was certain that WOODMAN repaid D.C. $65,000 before D.C. gave WOODMAN the $150,000 partnership contribution.

e.   WOODMAN has not repaid D.C. $150,000 or anything else by way of return (except for the return of the initial

3

$65,000 loan), despite repeatedly demanding that return from WOODMAN.

**B.      WOODMAN Induced B.B. into Investing in the Purported Purchase of a Colorado Warehouse**

7.      I interviewed B.B., of Los Angeles County and who worked for D.C., who told me the following:

a.      In or about March 2016, WOODMAN pitched B.B. a partnership opportunity to "purchase commercial warehouse space in Colorado."

b.      B.B. agreed to invest a total of $47,000 and provided that amount to WOODMAN.  B.B. expected that her money would be used as WOODMAN had represented, namely, to purchase and operate a warehouse located in Colorado, and B.B. would not have parted with her money had she known that WOODMAN intended to use B.B.'s money for a different purpose.

c.      WOODMAN and B.B. executed a partnership agreement for the warehouse space.  The partnership agreement stated that B.B. had a 17% partnership interest and that WOODMAN had the remaining 83% interest based on his $250,000 capital contribution.

d.      B.B. demanded that WOODMAN return B.B.'s investment when B.B. suspected that WOODMAN had not used B.B.'s money as he had represented.  WOODMAN agreed to fully repay B.B., but gave B.B., via text messages, a variety of excuses for failing to pay, including that he was in multiple car accidents, that he was in surgery, and that his bank account was suspended.

        e.    On or about December 1, 2016, WOODMAN gave B.B. a
check for $135,000, post-dated to December 2, 2016.  WOODMAN
told B.B. that the check represented B.B.'s return on the
warehouse investment.  WOODMAN asked B.B. to wait a while before
depositing the check.  B.B. did so.  The check bounced.  When
B.B. texted WOODMAN that the check had bounced, WOODMAN texted
B.B. to ask whether B.B. was "working with the D.A."  B.B.
continued to pressure WOODMAN to repay her via text messages,
after posting on WOODMAN's social media accounts, and after B.B.
reported WOODMAN'S theft of B.B.'s money to the Manhattan Beach
Police Department.  Ultimately, sometime in 2017, WOODMAN repaid
B.B.'s $50,000 with no return on the investment.

        **C.    Bank Records Show WOODMAN Did Not Use D.C.'s or B.B.'s
        Money As Represented**

        8.    I reviewed bank records for a Wells Fargo account
ending in x7554, in the name of "Aaron Woodman," for which
WOODMAN was the sole signatory (the "Wells Fargo x7554
Account"), and learned the following related to the use of
D.C.'s and B.B.'s money:

        a.    On or about April 23, 2015, WOODMAN opened the
Wells Fargo x7554 Account.

        b.    As of August 25, 2015, the account balance in the
Wells Fargo x7554 Account was approximately $677.

        c.    On or about August 26, 2015, the Wells Fargo
x7554 Account was credited with a wire transfer deposit of
$65,000.  The amount and timing of the credit was consistent

with WOODMAN'S receipt of D.C.'s purported $65,000 short-term loan to WOODMAN as described above.

      d.   On or about September 15, 2015, $150,000 was credited to the Wells Fargo x7554 Account.  The amount and timing of the credit was consistent with WOODMAN's receipt of D.C.'s purported $150,000 partnership contribution as described above.

      e.   Between on or about August 26, 2015 and January 26, 2016, the period of time following the short term loan and partnership contribution by D.C., and except for an approximately $36,000 deposit for "payroll," the source of which I could not determine, there were no other deposits to the Wells Fargo x7554 Account.  However, during that same date range, WOODMAN:

      i.   Withdrew approximately $135,566 in the form of ATM and/or bank branch cash and check withdrawals, to include a branch withdrawal of $35,000 on August 26, 2015, the same day that D.C. gave WOODMAN $65,000.

      ii.   Paid out of that account more than $115,834, including over $85,000 in online credit card payments for a credit card in his name, and over $30,000 in payments to department stores and for car payments, restaurants, and other expenses that appeared to be personal in nature.

      f.   Between March 18, 2016 and March 30, 2016, the period of time following the purported partnership investment by B.B., the following activity occurred in the Wells Fargo x7554 account:

i.   As of March 16, 2016, the account balance in the Wells Fargo x7554 account was approximately -$1,439.

ii.   On or about March 17, 2016, the Wells Fargo x7554 account was credited with a deposit of $47,000.  The credit was consistent with WOODMAN's receipt of B.B.'s purported partnership contribution.

iii.   The next day, WOODMAN withdrew approximately $25,000.

iv.   WOODMAN withdrew more than $17,000, including approximately $7,600 in online credit card payments; approximately $6,109 in travel expenses to Paris, France; approximately $2,646 in luxury goods purchases in Paris; and approximately $710 in restaurant purchases.

g.   None of the transactions in the Wells Fargo x7554 Account appeared consistent with the payment for expenses associated with the purchase and operation of a Colorado warehouse as WOODMAN had represented.  For example, there were no transactions related to payments for leasing commercial space, purchases of supplies and equipment, payments to employees or vendors, or payments of professional fees, receipt of commission, or payments from escrow companies.

**D.   WOODMAN Induced D.K. into Loaning WOODMAN $250,000 Based on a Bogus Real Estate Transaction**

9.   I interviewed D.K., an investor who lived in the State of Washington, who told me the following:

a.   D.K met WOODMAN in approximately June 2017 through a mutual acquaintance and realtor, K.Z.  Through K.Z.,

WOODMAN represented that he was working on a real estate deal in the Koreatown area of Los Angeles and that he needed, in effect, a short-term loan to cover costs associated with that pending real estate deal.

      b.   To induce D.K. to give WOODMAN money, WOODMAN emailed D.K. documents through K.Z., also a resident of the State of Washington, including documents that purported to show that WOODMAN would receive a fee of approximately $6.4 million on the sale of the Korea Town property that was expected to close escrow in June 2017, or a fee of at least $1.25 million if the sale did not close escrow.  One of the documents purported to be a letter from an entity identified as "Bold Escrow" that described the details of the same deal, including that the subject property was 9401 Wilshire Blvd., Los Angeles, CA, that the sales price was $180,000,000, and that the seller was an individual, E.S.

      c.   In reliance on WOODMAN's statements and documentation provided by WOODMAN, D.K. loaned WOODMAN $250,000 in June 2017, memorialized by a promissory note that WOODMAN emailed to D.K. through K.Z., and that provided for repayment by July 28, 2017.

      d.   The expected close of escrow date (July 2017) came and went without WOODMAN making repayment.  Instead, and only after D.K. pressured WOODMAN repayment, WOODMAN repaid D.K. $100,000 and offered a variety of excuses and information to lull D.K. into forbearing from collection efforts for the balance.  For example, WOODMAN told D.K. that Wells Fargo Bank

had frozen his account and that other real estate deals had not closed as expected.  WOODMAN also texted D.K. in August 2017 a photo of what appeared to be an image of a document relating to a balance in a WOODMAN Wells Fargo Bank account, showing an account balance of $522,392.

e.   WOODMAN gave D.K. a grant deed for WOODMAN's father's house in Michigan that was purportedly tenant-occupied and for which WOODMAN told D.K. that D.K. could collect rent until WOODMAN fully repaid D.K.  D.K. received approximately two months' rent payments.  D.K. then learned that WOODMAN had fabricated the grant deed and that WOODMAN's father neither consented to transferring his house nor knew anything about the grant deed.  WOODMAN further tried to placate D.K. by purporting to seek to refinance his father's house by asking D.K. to essentially release his interest in the house so that WOODMAN could obtain a loan against it.  That effort failed.

f.   D.K. had numerous email contacts with WOODMAN for nearly two years in which D.K. sought repayment and WOODMAN responded with excuses or statements of intent to repay. WOODMAN ceased communications with D.K. in mid-2019.

10.   D.K. also sent me documents that showed that WOODMAN used interstate wire communications in furtherance of his scheme to defraud D.K.  Specifically, D.K. sent me a June 28, 2017 email from WOODMAN to D.K.'s intermediary, K.Z., that WOODMAN had sent using the email account, aaron@aaronwoodman.com. WOODMAN attached to that email a copy of what appeared to be WOODMAN's California driver's license and a voided check for an

account into which WOODMAN directed D.K. to wire D.K.'s $250,000
loan investment.

11.  I have determined from a review of bank records that
the account related to the voided check was opened by WOODMAN
and that WOODMAN was the sole signatory.  Both those records and
the voided check showed WOODMAN's residence address as on 12571
Millennium, Apt. 409, Los Angeles, CA.  I have seen that address
as one that WOODMAN used as his residence during summer 2017 on
numerous bank records and other documents obtained during this
investigation.

12.   I compared an authentic copy of WOODMAN's driver's
license that I obtained through law enforcement databases to
that of the copy that WOODMAN emailed to K.Z.  The copy appeared
authentic and it and the authentic version each showed WOODMAN's
residence address as Camarillo, Ventura County, California, the
same address that I saw on bank statements and the signature
card for the Wells Fargo x7554 Account.

13.   Accordingly, I believe there is probable cause to
believe that WOODMAN used interstate wires, namely email
communications between himself in Los Angeles, California and
D.K., in the State of Washington, in furtherance of WOODMAN's
fraudulent scheme.

14.   I further investigated the purported real estate deal
that WOODMAN had described to victim D.K. and believe that there
is probable cause that WOODMAN made that "deal" up out of whole
cloth.  First, I learned from open sources that the address for
"Bold Escrow" was a drop box, namely, a location that housed

multiple post office boxes and not an escrow business.  Next, I
learned from bank records that WOODMAN had identified Bold
Escrow as a fictitious name of *his own* corporate entity, AWR
Investments LLC.  Next, I conducted a search of "Bold Escrow"
and of "Ryan Harris," the escrow officer whom WOODMAN had
identified for the transaction for which WOODMAN claimed
entitlement to fees as described above, through the California
Department of Financial Protection and Innovation that licenses
escrow agents and escrow companies in California.  Neither Bold
Escrow nor Ryan Harris were identified as licensees at any time.
Next, I examined the chain of title for 9401 Wilshire Blvd., Los
Angeles, the property on whose sale WOODMAN had claimed
entitlement to a fee.  Open source information showed that the
subject property was a 13-story office building that last sold
in December 2017 for approximately $111,331,500, or
approximately $70,000,000 less than WOODMAN had stated it was in
escrow to be sold for fewer than five months earlier.  Next, I
interviewed J.K., the CEO of a real estate management firm in
Santa Monica.  J.K. told me that his firm bought the 9401
Wilshire Blvd. high rise in December 2017.  I sent J.K.'s
assistant the documents that WOODMAN had provided to D.K. to
support WOODMAN's claim of entitlement to fees.  J.K. told me
that he reviewed those documents and that they were all fake.
J.K. also told me that he did not know WOODMAN, Bold Escrow,
R.H., E.S., who WOODMAN had identified as the seller of the
subject property, or S.H., who WOODMAN had identified as the
buyer.  Finally, I interviewed M.K., who told me that he is an

attorney who represented the seller of the 9401 Wilshire high rise.  I sent M.K. the documents that WOODMAN had given to D.K. to induce D.K. to make the $250,000 loan.  M.K. said the documents were fake.

### E.   Bank Records Show WOODMAN Misused D.K.'s Money

15.   I reviewed bank records for Wells Fargo Bank accounts and learned that WOODMAN received and moved D.K.'s money through several Wells Fargo Bank accounts that WOODMAN controlled and that showed that WOODMAN did not use D.K.'S money as WOODMAN had promised, as follows:

a.   Approximately a year earlier, in August 2016, WOODMAN had opened a bank account with Wells Fargo ending in x3107, in the name of "Aaron Woodman," for which WOODMAN was the sole signatory (the "Wells Fargo x3107 Account").  This is the same account for the voided check that WOODMAN emailed to D.K. in connection with directing D.K. to initially wire money to WOODMAN, as described above.

b.   As of June 29, 2017, the account balance in the Wells Fargo x3107 account was approximately -$214.  The next day, that account was credited with wire transfer deposit of $250,000, an amount consistent with the circumstances under which D.K. lent that amount to WOODMAN as described above.  And, that same day, $229,000 was transferred out of that account to yet another account at Wells Fargo Bank, ending in x0985 (the "Wells Fargo x0985 Account") for which WOODMAN was the sole signatory.  The balance in the Wells Fargo x0985 Account was zero just before that incoming transfer.

c.    Between June 30, 2017 and July 31, 2017, the following activity occurred in the Wells Fargo x3107 account:

i.    WOODMAN withdrew approximately $91,484 in the form of ATM and/or bank branch cash and check withdrawals and transferred $124,000 back to the Wells Fargo x3107 Account from the Wells Fargo x0985 Account to cover, in part, the approximately $91,484 in debits.

ii.    WOODMAN incurred personal expenses totaling over $27,915, including approximately $11,000 in online credit card payments and approximately $16,915 in payments to department stores, travel expenses, restaurants, and other personal expenses.

iii.    WOODMAN wrote several checks from the account totaling approximately $21,844, including a check for $12,204 made payable to Bidlane for what appeared to be a vehicle purchase.[1]

iv.    There were no other intervening deposits or credits to the Wells Fargo x3107 Account during this same period.

d.    Just before the end of July 2017, WOODMAN withdrew $100,000 from the Wells Fargo x0985 account to repay D.K.  In other words, D.K. used D.K.'s money to repay D.K.

---

[1] According to an online search, Bidlane is a car dealer with several locations throughout Los Angeles.  The check referenced "Rover Sport #577601" and "598 Reg fee + 11606.44".

13

**F.   WOODMAN Induced J.K. into Loaning $150,000 for a Real Estate Transaction**

16.   I interviewed J.K., who currently lives in Florida, who told me the following:

a.   In or about September 2018, J.K. met WOODMAN through a referral who mentioned that WOODMAN invested in real estate.  WOODMAN asked J.K. for a loan to finance WOODMAN's purchase of a property in Utah that WOODMAN intended to "flip" (purchase, renovate, and quickly resell).  WOODMAN promised that J.K. would receive a $25,000 return on the $150,000 loan, all to be paid in 30 days.

b.   J.K. asked WOODMAN for a financial statement. WOODMAN provided J.K. via email with a document titled "Statement of Financial Condition", dated September 12, 2018, showing that WOODMAN had total assets of $5,732,956, total liabilities of $4,089,120, and a net worth of $1,643,836.

c.   WOODMAN provided J.K. via email with a promissory note, signed by WOODMAN on September 13, 2018.  According to the promissory note, WOODMAN was to repay J.K. $175,000 by October 12, 2018.

d.   Based on WOODMAN's statements and documentation provided by WOODMAN, on or about September 14, 2018, J.K. wired WOODMAN approximately $150,000.

e.   J.K. has not received any repayment from WOODMAN despite J.K.'s repeated collection efforts.  For example, on November 1, 2018, in response to J.K.'s inquiry, WOODMAN emailed J.K. that he was waiting for additional money to come in from another real estate deal.  Throughout 2018 and until mid-2019,

WOODMAN continued to email J.K. excuses for non-payment.  In or about mid-2019, WOODMAN ceased contact with J.K.

  **G.  Bank Records Show WOODMAN Misused J.K.'s Money**

  17.  I reviewed bank records relating to the deposit and use of J.K.'s investment funds and learned the following:

    a.  On or about September 1, 2017, WOODMAN opened a bank account with Wells Fargo ending in x3308, in the name of "ARW Investments LLC dba Bold Escrow," for which WOODMAN was the sole signatory (the "Wells Fargo x3308 Account").  WOODMAN identified the business as "Residential Real Estate Property and Funds Holdings."  As of September 13, 2018, the account balance in the Wells Fargo x3308 Account was approximately -$869.

    b.  On or about September 14, 2018, the Wells Fargo x3308 Account was credited with a wire transfer deposit of $150,000, an amount consistent with the circumstances of J.K.'s investment of $150,000 as described above.

    c.  Between September 14, 2018 and September 27, 2018, there were two debits to the Wells Fargo x3308 Account, totaling approximately $98,000, that appeared to be consistent with the purchase of a property located in Utah.  For example, of that amount, there was a $50,000 wire transfer to a title service business in Utah.

    d.  However, around that same time, WOODMAN wrote a check, number 6002, on September 13, 2018, for approximately $46,268, and payable to Porsche of Salt Lake.

**H. WOODMAN Induced A.D. into Loaning $40,000 for a Real Estate Transaction**

18.    I interviewed A.D., who currently lives in Texas, who told me the following:

a.    WOODMAN had been A.D.'s high school tennis coach. WOODMAN and A.D. kept in touch periodically over the years since A.D. graduated from high school.  Around December 2018, WOODMAN solicited A.D. to invest with WOODMAN.  WOODMAN stated that he raised capital, had deals all over the world, and that he could help A.D. get better returns on his investments.  WOODMAN told A.D. that WOODMAN would use A.D.'s loan to buy property, "flip" the property, and earn A.D. a twenty percent return on his investment.

b.    Based on WOODMAN's statements, on or about January 30, 2019, A.D. caused to be wired to WOODMAN $40,000 to invest in real estate as WOODMAN had represented.  WOODMAN emailed to A.D. a promissory note by which A.D. would be repaid $40,000 plus $8,000 interest by March 28, 2019.

c.    When WOODMAN did not pay A.D. as initially agreed, WOODMAN and A.D. signed a settlement agreement by which WOODMAN agreed to pay A.D. a total of $53,000.  WOODMAN never paid A.D. that amount, or any other amount, but admitted in a text message that he owed A.D. at least the original amount that A.D. had given WOODMAN.

**I. Bank Records Show WOODMAN Misused A.D.'s Money**

19.    I reviewed records for the Wells Fargo x3308 Account, described above, and learned the following:

a.   On January 28, 2019, the account balance in the Wells Fargo x3308 Account was approximately -$1,330.

b.   On January 30, 2019, that account was credited with an incoming wire transfer of $40,000 from A.D. (who was identified by his name on a line item for the bank statement for the Wells Fargo x3308 Account) that was consistent with the circumstances surrounding A.D.'s $40,000 investment as described above.

c.   There were no other deposits to the Wells Fargo x3308 Account between January 28, 2019 (the date on which the balance was approximately -$1,330) and February 6, 2019, during which time the following transactions, among others, were booked on that account:

i.   WOODMAN withdrew approximately $6,500 in cash in the form of bank branch withdrawals.

ii.   WOODMAN caused payments of approximately $22,182 in online credit card payments and payments to department stores, travel companies, and shops including, for example, approximately $5,000 to Delta Airlines for tickets relating to travel to Johannesburg, South Africa, hundreds of dollars in payments to Lululemon and Jovani Linens, and approximately $1,949 to "The St Regis Resor Le Morne Mus" which I learned from an open source search likely refers to the St. Regis Resort Hotel located in Le Morne on the island of Mauritius that is located off the southeast coast of Africa.

iii.   WOODMAN caused three wire transfers, two of which totaled $1,500 to D.K., the same individual identified

17

above who had invested money with WOODMAN, and one wire transfer
to B.S. totaling $10,000.  I interviewed B.S. who told me that
he had no recollection of the transaction, did not recall
knowing WOODMAN, and was not associated with the real estate
deal that A.D. intended to invest in.

       iv.   There were no transactions on the Wells
Fargo x3308 Account or any other Wells Fargo account associated
with WOODMAN that appeared to be consistent with actually buying
or flipping real estate on behalf of A.D.

     **J.**   **WOODMAN Moved to Liberia**

     20.   One of the multiple email accounts for WOODMAN that I
learned about during this investigation was
awoodman998@gmail.com.  A subpoena response from Google further
identified this account as subscribed to by "Aaron Woodman" and
that the account was created on May 7, 2020.  I know from my
training and experience that gmail accounts (hosted by Google)
allow a subscriber to recover gmail and other account
information by using "short messaging system" or "SMS" texting
from a mobile phone.  The subscriber is required to input a
specific mobile number for such access.  The Google subpoena
response for the above-described account included an SMS number
as "233596055271."  An internet search for that SMS number shows
that the "233" pertains to the area code for the country of
Ghana, which shares a border with Cote d'lvoire, a neighboring
country of Liberia.

     21.   A.D., mentioned above, also told me that he created a
website to solicit information from others whom WOODMAN had

defrauded.  The website directed respondents to report their
complaints to E.V., an attorney for the Texas State Securities
Board.

22.  In early May 2020, E.V. emailed my office and stated
that he (E.V.) had interviewed a respondent to A.D.'s website.
I reviewed E.V.'s email to my office and learned the following:

a.  E.V. interviewed J.S. who lives in South Carolina
and works with a charitable organization that raises money to
benefit children in Africa.  The charity is based in Monrovia,
Liberia.

b.  J.S. spends time in Liberia in connection with
the operation of the charity.

c.  In early May 2020, J.S. met WOODMAN in Monrovia,
Liberia.  WOODMAN claimed that he would be making a large
investment in the Liberian and Ghanaian infrastructure, roads
and utilities as those countries revitalize their economies.
WOODMAN offered to wire a $95,000 contribution to J.S.'s charity
and requested that J.S. provide WOODMAN with the charity's bank
account and related information to facilitate the wiring of
WOODMAN's contribution.

d.  J.S. communicated with WOODMAN via "WhatsApp," a
free, internationally used chat service that offers encryption
for users.  WhatsApp users can easily, however, store their
chats in a ".txt" file, which is like a digital notepad that can
be read by most common word processing software.

e.  J.S. forwarded to E.V. his ".txt" file of a chat
with WOODMAN dated April 26-27, 2020.  I read that file.  In

that chat, WOODMAN stated that he "[l]ive[d] in [L]iberia in [C]ongotown," that he had [b]een in [L]iberia for 7 months straight, came to Ghana for business," and "have several businesses in Liberia and have a Liberian [girlfriend] that's well connected."

f.   In that same ".txt" file, when J.S. offered to set up a subsequent call with WOODMAN, WOODMAN stated "[p]lease can we use WhatsApp. I don't use my American sim."  I know from my training and experience that "sim" is the acronym for "subscriber identity module" or "subscriber identification module," a tiny integrated circuit that stores unique subscriber information inside a mobile phone, and that use of a mobile phone for which a subscriber's sim was issued as part of a mobile phone subscription in the United States could generate data that could enable law enforcement to determine the location of the subscriber.

23.   Based on the foregoing, on my communications with the victims identified herein, and on documents provided to me by other law enforcement and regulatory agencies to which individuals reported that WOODMAN had defrauded them, including the Manhattan Beach Police Department, the U.S. Securities and Exchange Commission, and the Texas State Securities Board, there is probable cause to believe that WOODMAN was being pursued by numerous victim-creditors, was aware of law enforcement and regulatory scrutiny, and fled the U.S. for Liberia notwithstanding that the United States has an extradition treaty with Liberia.

## V.   <u>CONCLUSION</u>

24.   Based on the foregoing, I have probable cause to believe that AARON ROBERT WOODMAN committed wire fraud, in violation of Title 18, United States Code, Section 1343, and request that the Court issue the requested warrant.

/s/
_____

ROBERT CHOWTHI, Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before me
on March __12 2021.

UNITED STATES MAGISTRATE JUDGE

21